IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOHNSON,                          :    CIVIL ACTION
                                  :    NO. 04-2835
        Petitioner,               :
                                  :
             v.                   :
                                  :
                                  :
FOLINO, et al.,                   :
                                  :
        Respondents.              :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                        NOVEMBER 23, 2009


        Before the Court is petitioner Roderick Johnson's
("Petitioner") motion to depose Berks County Sheriff Eric
Weaknecht ("Sheriff Weaknecht") concerning Petitioner's claim for
an alleged violation of Brady v. Maryland.  The subtext of this
motion implicates whether Petitioner's alleged Brady claim has
been procedurally defaulted in state court.

        Petitioner's alleged Brady violation pertains to
undisclosed impeachment evidence related to certain government
witnesses who testified unfavorably at Petitioner's trial.
Petitioner proposes to depose Sheriff Weaknecht regarding the
administrative policies and procedures of the Berks County
Sheriff's Office concerning the issuance of gun permits in
general and how the policy was applied to Commonwealth witness

-1-

George Robles.  This request relates to Petitioner's claim that a witness against him unlawfully possessed a gun permit with the assistance of the Berks County Sheriff's Office.

For the reasons that follow, the Court finds that Petitioner's alleged <u>Brady</u> violation is unavailable for review due to procedural default in the state court, and therefore, Petitioner's motion to depose Sheriff Weaknecht will be denied as moot.

I.   BACKGROUND

On July 14, 1998, Petitioner, was convicted of first-degree murder and related charges in the Berks County Court of Common Pleas with respect to the November 1, 1996 shooting death of Jose Martinez ("Martinez").  (Petition for Writ of Habeas Corpus ¶ 4.)  On July 15, 1998, Petitioner was sentenced to life imprisonment without parole.  (<u>Id.</u>)  The Commonwealth's case relied heavily on testimony of three witnesses: George Robles ("Robles"), Luz Cintron ("Cintron," Robles' girlfriend) and Mylta Velazquez ("Velazquez," Petitioner's estranged girlfriend).  (<u>Id.</u> at ¶¶ 17-21.)[1]

---

[1]    The Commonwealth also presented the testimony of Pearl Torres and Shannon Sanders at Petitioner's trial.  Ms. Torres observed one male chasing and then shooting another male, but was unable to identify Petitioner as the shooter.  (<u>Id.</u> at ¶ 16.) Ms. Sanders testified that a man ran past her near the scene of the shooting and stated that someone was dead and that the speaker was responsible for the shooting.  (<u>Id.</u>)  Ms. Sanders

Velazquez testified that Petitioner told her that he shot Martinez and was a "hit man." (Id. at ¶ 17.) Cintron, who knew Petitioner through Robles, testified that she overheard a conversation in November 1996 in which Petitioner admitted responsibility for shooting Martinez while driving with his co-defendant Richard Morales ("Morales"). (Id. at ¶ 18.) Robles, who was an acquaintance of Petitioner, likewise testified that Petitioner made incriminating statements directly to him regarding Martinez's homicide. (Id. at ¶¶ 21, 27.)

A.    Petitioner's Alleged Brady Evidence

Petitioner's Brady claim is founded mainly on the theory that Robles maintained a corrupt relationship with police officers for the City of Reading, and that Petitioner was denied access to evidence which establishes this corrupt relationship and impeaches the testimony of Robles. Petitioner further maintains that the Commonwealth withheld impeachment evidence concerning Cintron, Velazquez, and Morales in violation of Brady. The relevant Brady material relied upon by Petitioner with respect to each witness is as follows:

Cintron: (1) affidavits by several investigators produced post-trial recounting a statement by Cintron that she was coerced into testifying by the investigating police officers

---

also was unable to identify Petitioner as the shooter despite that fact that she knew the Petitioner independently. (Id.)

and Robles; (2) a Reading Police Report dated July 7, 1998, two days before Cintron testified at Petitioner's trial, in which she is listed as a suspect in an assault case; and (3) an inconsistent statement in a police report investigating Robles' involvement in a February 27, 1996 shooting incident concerning a contradiction in Robles' whereabouts during the incident.

Velazquez: affidavits by defense investigators produced post-trial containing statements from Velazquez that she testified against Petitioner only after being threatened by the investigating officers with criminal conspiracy charges.

Morales: a police report by Reading Police Detective Vega stating that he saw Morales near the scene of the homicide after it occurred and that Detective Vega had seen Morales at the courthouse prior to the homicide.

Robles:[2] (1) Robles was a member of a group identified as the Nyte Life Clique (NLC) through which Robles engaged in criminal activities and otherwise "ran the streets;" (2) Robles' statement that he smoked marijuana in the presence of Reading Police Detectives Angel Cabrera ("Cabrera") and Bruce Dietrich ("Dietrich"), and was told by Cabrera that his "potpourri and marijuana did not mix too well," but that Robles was not arrested for this conduct; (3) a statement by Robles that Detectives

---

[2]     Due to the multitude of allegations relating to Robles and in the interest of efficiency, the Court recounts here only the most relevant material cited by Petitioner.

Cabrera, Dietrich, and Vega would question him regarding certain criminal activities and that Robles was complimented by Cabrera and Dietrich about his intelligence in the way Robles "ran things;" (4) a statement by former Berks County Detective Joseph Stajkowski that Cabrera and Dietrich were involved in illegal narcotics trafficking; (5) a letter from Robles to Cabrera stating "I'll do anything" to be released from custody; (6) an investigation involving an April 25, 1996 shooting incident at 644 Bingham Street in which Robles' latent fingerprint was found on a cigar box, which contained 103 bags of crack cocaine and cash, and was recovered from the shooting suspect; (7) that Cabrera and Dietrich returned a safe containing a gun and a cell phone recovered during the investigation of the April 25, 1996 incident to Robles; (8) that Robles was a suspect in the investigation of a February 27, 1996 incident in which an individual (allegedly Robles) assaulted Angel Alvarez and Alberta Collins by threatening them with a firearm; (9) during the investigation of an August 1, 1997 shooting incident in Reading, Pennsylvania, Robles was identified at the scene of the alleged incident (in addition to several other individuals), questioned by police, found to be in possession of a handgun which used similar casings to those fired, and had this weapon confiscated by police but returned to him at a later date; (10) that Robles was questioned as a suspect in the investigation of a September

18, 1997 shooting in Reading for which Robles was never charged; (11) that a gun belonging to Robles was involved in a November 7, 1997 shooting incident at 545 Cedar Street in Reading and Robles was not prosecuted; and (12) numerous affidavits and statements indicating that Robles was heavily involved in narcotics activity.

### B.  Discovery Obtained in These Proceedings

Discovery has been ongoing in this matter since January 4, 2007, when the Court granted Petitioner's motion for discovery.  (doc. nos. 53, 59.)  Initially, the Court set a discovery deadline of March 21, 2007.  Every deadline was met by yet another discovery request by Petitioner.  Ultimately, the Court required the parties to show cause why discovery should not be closed.  (doc. no. 113.)  In response, Petitioner filed another motion for further discovery seeking (1) discovery already ordered by the Court but not yet produced; and (2) leave to take depositions.  (doc. no. 115.)  The Court granted the motion in part and denied the motion in part.  (doc. no. 120.)[3]

At this time, the Court concludes that Petitioner has

---

[3]    The Court granted Petitioner's request for (1) disposition sheets relating to the drugs seized during the incident at 644 Bingham Street; (2) the Reading Police report on the shooting of McCarthy Hernandez, Reading Police Assignment No. 55610-95; and (3) information related to the March 1998 contact between Reading Police and Cintron.  The Court denied Petitioner's request for discovery on (1) three warrants against Rafael Melendez; and (2) resolution of certain criminal charges against Cintron.

been accorded ample opportunity to engage in a comprehensive discovery process to develop a full and accurate record with respect to the alleged <u>Brady</u> claims.[4]

---

[4]    The following is a summary of discovery that has been provided, will be provided, or is unobtainable after Respondents expended considerable effort to comply with the Court's discovery orders:

- A copy of the tapes of the telephone conversations between Petitioner and Velazquez that occurred on January 19, 2004, February 5, 2004, and February 14, 2004  (doc. no. 58);
- Any and all documents in possession of the Berks County District Attorney's Office, the Reading Police Department, or any other agency involved in the prosecution of Petitioner in the instant case (the Prosecutorial Agencies) which concerns, relates, or evidences a relationship, if any, between the Prosecutorial Agencies and any of its agents or employees, including but not limited to Dietrich, Cabrera, and Gerardo Vega, and Robles, including any documents relevant to Robles being a paid or unpaid informant or a cooperating witness for the Prosecutorial Agencies (doc. no. 59). Respondents proffer, and Petitioner does not contest, that Petitioner has every Reading Police report containing the name "George Robles."  In addition, the Commonwealth provided a sworn statement that Robles was not a paid informant for the Reading police.  (Ex. 8, Pet'r Resp. Protective Order, doc. no. 110);
- The Reading Police Department personnel files, and any police internal investigation files, regarding Detectives Dietrich and Cabrera (except for any medical information contained therein) (doc. no. 59);
- Any and all documents, concerning any and all contact by law enforcement officers and members of the Berks County District Attorney's Office with Cintron and/or Velazquez (doc. nos. 59, 76);
- All documents, including notes, supplemental police reports, reports, correspondence or any other information concerning the investigation into other suspects, including but not limited to

-7-

Samuel De La Cruz, Edwin Vargas Ruiz, Frankie, a person identified in supplemental police report dated November 7, 1996, named Mark with a Spider tattoo on his arm who is alleged to have killed the victim over a drug deal on Pearl Street (doc. no. 59);

- Clear, clean copies of the photos attached as Exhibit 23 to Petitioner's Motion for Discovery from which one can discern the likenesses of the individuals in the photos (doc. nos. 59, 76);

- Copies, transcripts, and computer codings, if they exist, of 911 tapes and all audiotapes and or videotapes concerning this case including, but not limited to, an audiotape identifying someone named Roddy as responsible for shooting Martinez (doc. nos. 59, 76);

- Documents related to the shooting incidents at 644 Bingaman St. on April 25, 1996, and at Robles' house on November 7, 2007, including but not limited to the reports generated in Assignment Nos. 19948-96 and 20295-96 (doc. no. 76);

- An affidavit containing an explanation of the extent and nature of Respondents' searches for: (a) a letter that Robles purportedly sent to Baldwin; and (b)information on whether Robles was an informant, paid or otherwise (doc. no. 76);

- Any and all reports and documents concerning or related to Reading Bureau of Police Assignment No. 7443-96 (doc. no. 110);

- Any and all reports concerning or related to the investigation of the Ricky Cintron murder[,]" (doc. no. 110) only to the extent that any of those documents refer to Robles or another witness at Petitioner's trial (doc. no. 110);

- Concerning the punishment or lack of punishment received by Cintron related to Criminal Investigation Report No. 39080-98, Respondents shall either (a) produce any and all information about Cintron's punishment or lack of punishment from the District Attorney's file in the case, or (b) permit Petitioner's counsel to review the full District Attorney's file in the case (doc. no. 110);

- Relating to the April 25, 1996, Bingaman St. shooting incident, Respondents shall (a) produce three warrants for Rafael Melendez; (b) produce

II.  PROCEDURAL HISTORY[5]

      Petitioner filed a direct appeal of his sentence on August 14, 1998.  The Superior Court affirmed the decision on July 15, 1999, and the Pennsylvania Supreme Court denied Petitioner's allowance of appeal on December 30, 1999.

      On December 21, 2000, Petitioner filed his first

---

           any and all police reports in Assignment No. 22604-96, and (c) permit Petitioner's counsel to review the evidence seized and disposition sheets for each item seized, as reported in Reading Police reports and documents for Assignment No. 19948-96 (doc. no. 110);

- Respondents shall produce any and all documents and reports related to the January 13, 1999, search warrant involving 211 Mulberry St., Reading, PA, including but not limited to the reports in Assignment No. 2306-99 (doc. no. 110);
- Respondents shall produce any and all documents and reports concerning or related to Reading Police contacts with Robles up to and including 2004 for any contacts that concern or relate to Petitioner, his case, a related case or investigation, or a case or investigation concerning co-defendants Shawnfatee Bridges or Richard Morales (doc. no. 110);
- Reading Police Assignment No. 55610-95, the report on the shooting of McCarthy Hernandez (doc. no. 120); and
- March 1998 contact between Reading Police and Cintron (doc. no. 120).

[5]  The Court's recitation of the complex and extensive procedural history of Petitioner's case is based upon the comprehensive February 25, 2008 memorandum opinion written by Judge Ludgate of the Court of Common Pleas of Berks County.

Petition for Post-Conviction Relief pursuant to 42 Pa. C.S.A. §
9543 ("PCRA") and was denied relief on November 29, 2001.  This
denial was affirmed by the Superior Court on January 8, 2003, and
the Pennsylvania Supreme Court denied Petitioner's further
request for relief on March 22, 2004.  During the pendency of
appeal from his first PCRA petition, Petitioner filed a second
PCRA petition on September 12, 2003, which was later refiled on
April 13, 2004.  Petitioner sought to supplement this second PCRA
petition with alleged <u>Brady</u> material, but the Court of Common
Pleas refused to grant this request and denied Petitioner's
second PCRA petition on September 22, 2004.  The Court of Common
Pleas held that Petitioner's newly asserted <u>Brady</u> claim was
untimely under the PCRA statute and none of the statutory
exceptions were applicable.  The Superior Court affirmed the
denial of this second PCRA petition on September 22, 2005.

During the interim in which Petitioner's first and
second PCRA petitions were under review by the Pennsylvania state
courts, Petitioner filed the instant habeas petition.  Petitioner
filed the petition in this matter on June 25, 2004, and the Court
has accommodated Petitioner in several instances in staying
certain aspects of these proceedings in order to facilitate
exhaustion of Petitioner's state court petitions.

On June 19, 2007, August 2, 2007, and November 16,
2007, Petitioner filed his third, fourth, and fifth "protective"

PCRA petitions, respectively.  These petitions were dismissed by the Court of Common Pleas on December 6, 2007, again based upon the untimeliness of the petitions.  The Superior Court affirmed this decision on January 22, 2009.

During a telephone conference held in this matter on July 23, 2009, this Court instructed the parties to submit briefing on the exhaustion issue with respect to Petitioner's <u>Brady</u> claim only in order to determine whether additional discovery on this issue was necessary and whether the <u>Brady</u> claim is ripe for review by this Court.  The parties having complied with the Court's direction, the issue is ready for adjudication


III. ANALYSIS

A.    <u>Brady Violations</u>

Under <u>Brady v. Maryland</u>, the prosecution must produce to the defendant evidence that is material to either guilt or punishment, irrespective of good or bad faith.  373 U.S. 83, 87 (1963); <u>see also</u> <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985) (extending <u>Brady</u> to impeachment and exculpatory evidence); <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972).  A well-established three-part test is to be applied by the Court in determining whether a <u>Brady</u> violation has occurred: (1) the evidence at issue must be favorable to the defendant, either because it is exculpatory or impeaching in nature; (2) the

evidence must have been either willfully or inadvertently suppressed by the government; and (3) prejudice must result from this suppression. See Banks v. Dretke, 540 U.S. 668, 691 (2004) (citing Strickler v. Green, 527 U.S. 263, 281-82 (1999)); Lewis v. Horn, 581 F.3d 92, 108 (3d Cir. 2009).

"Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different[.]'" Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (quoting Strickler, 527 U.S. at 280). However, a "showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.]" Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). A conviction would only be reversed if there is a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Youngblood, 547 U.S. at 570 (quoting Kyles, 514 U.S. at 435).

Based upon these principles, courts are required to conduct two independent inquiries in order to determine whether a Brady violation has occurred. Smith v. Holtz, 210 F.3d 186, 196 (3d Cir. 2000). The first inquiry is "whether the prosecution must disclose the evidence, i.e., whether the evidence is Brady material." Id. The second, and independent inquiry, is "whether

suppression of that evidence undermines confidence in the outcome

of a criminal trial, i.e., whether the evidentiary suppression

constitutes a Brady violation.  Id.; see also Strickler, 527 U.S.

at 281-82 (distinguishing between Brady material and a Brady

violation on the ground that nondisclosure of Brady material only

evolves into a Brady violation where the nondisclosure is "so

serious that there is a reasonable probability that the

suppressed evidence would have produced a different verdict").  A

cognizable Brady claim exists only where both of these elements

are present.

    B.   Applicable Law on Exhaustion and Procedural Default

       Under the exhaustion doctrine, a federal court is

precluded from considering the merits of a habeas petition where

the petitioner has failed to exhaust state remedies.  See 28

U.S.C. § 2254(b)(1)(A); O'Sullivan v. Boerckel, 526 U.S. 838, 842

(1999).  The exhaustion doctrine requires that a state prisoner

allow the "the state courts one full opportunity to resolve any

constitutional issues by invoking one complete round of the

State's established appellate review process."  Id. at 845; see

also Woodford v. Ngo, 548 U.S. 81, 92 (2006).

       In order to exhaust a claim, it must be "fairly

presented" to the state courts, meaning that the petitioner has

raised "the same factual and legal basis for the claim to the

state courts."  Nara v. Frank, 468 F.3d 187, 197-98 (3d Cir.

-13-

2007) (citing Duncan v. Henry, 513 U.S. 364, 366 (1995) (per curiam)).  Exhaustion can only be established when the petitioner "presents" to the state court substantially the same claim for which he seeks review before the federal court.  See Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004).  The petitioner retains the burden to prove all facts relevant to the exhaustion requirement.  Lambert v. Blackwell, 134 F.3d 506, 513 (3d Cir. 1998) (citing Toulson v. Beyer, 987 F.2d 984, 987 (3d Cir. 1993)).

The doctrine of exhaustion is inapplicable where the unexhausted claim would not be considered by the state courts because it is procedurally barred.  See Doctor v. Walters, 96 F.3d 675, 681 (3d Cir. 1996).  Exhaustion is only excused when the state law "clearly foreclose[s] state court review of [the] unexhausted claims."  Id. (quoting Toulson, 987 F.2d at 987). "Whereas the exhaustion inquiry asks whether a claim was 'presented to the state courts,' the procedural default analysis considers whether the claim was 'presented in the manner that state law requires.'"  Boyd v. Waymart, 579 F.3d 330, 368 (3d Cir. 2009) (Hardiman, J., dissenting) (quoting Edwards v. Carpenter, 529 U.S. 446, 452 (2000) (emphasis added)); see also id. ("[T]he Supreme Court has made clear that a procedural default 'forecloses relief even when the petitioner has exhausted his remedies.'" (quoting O'Sullivan, 526 U.S. at 850 (Stevens,

J., dissenting)).

A federal court is precluded from reviewing procedurally defaulted claims unless the prisoner can demonstrate either: (1) cause for the default and prejudice resulting from the violation; or (2) that failure to review the alleged claims will result in a "fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991). In order to satisfy the cause and prejudice requirements, "a petitioner must demonstrate some objective factor external to the defense that prevented compliance with the state's procedural requirements." <u>Cristin v. Brennan</u>, 281 F.3d 404, 412 (3d Cir. 2002). To show a fundamental miscarriage of justice will result absent review, the petitioner is required to present new evidence that "he is actually innocent of the crime . . . by presenting new evidence of innocence." <u>Id.</u> (internal quotation omitted).

Establishing "cause and prejudice" in the context of procedural default of an alleged <u>Brady</u> claim, "parallel[s] two of the three components of the alleged <u>Brady</u> violation itself." <u>Banks</u>, 540 U.S. at 691 (quoting <u>Strickler</u>, 527 U.S. at 282). The concept of "cause" coincides with the second <u>Brady</u> component (showing that evidence was suppressed by the government), whereas a showing of "prejudice" is equivalent to establishing that evidence was "material" for <u>Brady</u> purposes. <u>Id.</u> (internal citation omitted). Therefore, a determination of whether a

showing of "cause and prejudice" has been made mirrors an analysis of the merits of the suppression and materiality prongs of the Brady analysis. Id.[6]  In other words, if the government wrongfully suppresses evidence, then an external factor prevented a petitioner's compliance with state procedure, and if the withheld evidence was material to a petitioner's trial, then barring a petition on procedural grounds would create prejudice.

C.   Discussion

It is undisputed that Petitioner's Brady claim can no longer be presented to the Pennsylvania state courts for review because it is untimely.  Under these circumstances, the exhaustion requirement is excused on the basis of futility.  See Slutzker v. Johnson, 393 F.3d 373, 380 (3d Cir. 2004). Exhaustion will be excused as "futile" if "the state court would refuse on procedural grounds to hear the merits of the claims." Doctor, 96 F.3d at 681; Szuchon v. Lehman, 273 F.3d 299, 323-24 n.14 (3d Cir. 2001).[7]  Although Petitioner is able to clear the

_____

[6]   While Petitioner must also satisfy the first Brady component (relevant evidence is favorable as either impeachment or exculpatory evidence) to succeed on his Brady claim, there is no dispute that the evidence which Petitioner alleges was withheld would qualify as favorable impeachment evidence subject to disclosure under Brady.  See Bagley, 473 U.S. at 676 (finding that impeachment evidence is covered by Brady)

[7]   Although futility clearly establishes that exhaustion is excused in this circumstance, the Court could alternatively find that because the claims were presented before the Pennsylvania state courts, although not ruled upon on the merits, they were "fairly presented" in a manner that satisfies the

-16-

barrier of exhaustion, the habeas doctrine of procedural default applies and bars this Court from considering the Brady issue.

As an initial matter in the procedural default analysis, the Court finds that the refusal by the Pennsylvania state court to review the Brady claim on the basis of timeliness is an adequate and independent state grounds. See Slutzker, 393 F.3d at 381 (noting that the "raison d'être for the [procedural default] doctrine lies in the fact that a state judgment based on procedural default rests on independent and adequate state grounds.") (citing Coleman, 501 U.S. at 730). In Slutzker, the Third Circuit instructed that the failure to raise a Brady violation within the statute of limitations pursuant to the PCRA qualifies as an independent and adequate state grounds to constitute a procedurally defaulted claim. Id.

Therefore, in order to overcome this procedural default barrier, Petitioner must establish "cause and prejudice" or a "fundamental miscarriage of justice." Id. The Court will address these alternative grounds ad seriatim.

_____

exhaustion requirement. See Johnson, 392 F.3d at 556 (finding that the exhaustion requirement was satisfied even though the merits of the claim were not considered because the petition was untimely); Swanger v. Zimmerman, 750 F.2d 291, 295 (3d Cir. 1984) (concluding that a finding of exhaustion was not precluded where the state court chose not to address the merits of petitioner's claims after a finding of waiver); Barnhart v. Kyler, 318 F. Supp. 2d 250, 256 (M.D. Pa. 2004) ("Late or untimely filings, even if insufficient under state procedural rules, satisfy the exhaustion doctrine.") (internal citations omitted).

1.   Cause and Prejudice

As explained above, the Court's analysis of "cause and prejudice" mirrors the second and third prongs required under Brady.  First, suppression of evidence by the government constitutes an external factor that qualifies as sufficient "cause" to overcome procedural default of a Brady claim.  See Strickler, 527 U.S. at 282 (finding that the suppression of exculpatory documents "constitutes one of the causes for the failure to assert a Brady claim in the state courts").  Second, Petitioner can only establish "prejudice" by demonstrating that the withheld evidence was material under Brady.  If the Brady claim lacks merit, then Petitioner cannot establish prejudice. See Slutzker, 393 F.3d at 385 (noting that the determination of whether the prejudice prong has been satisfied for the procedural default of a Brady claim "is identical to the analysis of materiality under Brady itself."  (citing Strickler, 527 U.S. at 282); Albrecht v. Horn, 485 F.3d 103, 132 (3d Cir. 2007).

Here, Petitioner cannot establish both cause (i.e., wrongful suppression by the Commonwealth) and prejudice (i.e., materiality under Brady) with respect to the evidence regarding Robles, Cintron, Velazquez and Morales.  Therefore, the procedural default rule precludes review of these claims by the Court.

(a) Robles

Petitioner cannot establish prejudice with respect to any of the allegedly withheld evidence regarding Robles because it does not satisfy the materiality standard under Brady. Petitioner relies upon a litany of evidence demonstrating Robles was at least tangentially involved in criminal investigations in order to assert that a corrupt relationship existed between Robles and the Reading Police Department.  It is true that information regarding a witness' arrangement with the prosecution regarding criminal charges can affect the credibility of the witness and may satisfy Brady.  See Simmons v. Beard, 581 F.3d 158, 170 (3d Cir. 2009) (citing Giglio, 405 U.S. at 153-54). Petitioner, however, cannot point to any express or implied agreement between Robles and Commonwealth prosecutors which resulted in the dismissal of any charges against Robles. Instead, Petitioner emphasizes that Robles' "uncharged criminal conduct" demonstrates the existence of a corrupt relationship and constitutes material impeachment evidence under Brady.

Petitioner fails to recognize, however, that because this evidence pertaining to "uncharged criminal conduct" is inadmissable under Pennsylvania law to impeach a witness, it cannot be considered material for purposes of Brady.  United States v. Oxman, 740 F.2d 1298, 1311 (3d Cir. 1984), vacated on other grounds, 473 U.S. 922 (1985) ("In order to be material, evidence suppressed must have been admissible at trial."); United

-19-

States v. Stewart, 325 F. Supp. 2d 474, 502 (D. Del. 2004); Pagan v. Brooks, Civ. No. 07-4780, 2008 WL 4838353, at *13-14 (E.D. Pa. Nov. 5, 2008) (Golden, J.) (finding that no Brady violation occurred where state court refused to admit prior internal affairs investigation of police officer which was inadmissible under state rule precluding presentment of prior bad acts). It is clear that under Pennsylvania law, uncharged criminal conduct may not be used to test the veracity of a witness, where such prior conduct has not led to convictions. Commonwealth v. Chmiel, 889 A.2d 501, 534 (Pa. 2005) (citing Commonwealth v. Jackson, 381 A.2d 438, 439 (Pa. 1977)); Pa. R. E. 609(a)). Here, none of the evidence presented by Petitioner with respect to Robles' run-ins with law enforcement resulted in any convictions, let alone any formal charges being filed. Therefore, the uncharged criminal conduct asserted by Petitioner cannot be considered material under Brady and its progeny.

Furthermore, assuming arguendo that the evidence alleged by Petitioner with respect to Robles' interaction with Reading police would have been available to impeach Robles, it does not rise to the level of materiality required under Brady. Petitioner contends that a reasonable inference could be drawn by the jury that Robles received favorable treatment from the Reading Police with respect to his criminal activities in response to his willingness to assist in Petitioner's criminal

prosecution.  There are two distinct defects with Petitioner's theory.

First, the decision of whether charges are brought against an individual is within the sole discretion of the state prosecutor.  Under Pennsylvania law, police officials are not empowered to make charging decisions.  Rather, the charging decisions here were made by the Berks County District Attorney's Office and not the Reading Police.

Second, Petitioner argues that a trier of fact could have drawn the inference that the Reading Police documented these alleged criminal activities in the police incident reports in order to hold them over Robles' head in the event he refused to cooperate in the future.  An equally plausible inference that could be drawn is that Robles was investigated with respect to several criminal matters, but that insufficient evidence existed to initiate any formal charges against him.  Thus, since this evidence is subject to equally plausible inferences, it would not "put the whole case in such a different light as to undermine confidence in the verdict," Youngblood, 547 U.S. at 570 (quoting Kyles, 514 U.S. at 435), and the required showing of materiality is absent.

Absent a showing of materiality, Petitioner cannot establish prejudice with respect to this information.

(b) Cintron

Petitioner relies upon the following impeachment evidence in support of his Brady claim with respect to Cintron: (1) affidavits by Petitioner's investigators written after Petitioner's trial recounting a statement by Cintron that the Reading Police and Robles coerced her into testifying; (2) a Reading Police Report dated July 7, 1998 (the "July 1998 Report"), in which Cintron was investigated for an assault; and (3) a Reading Police Report dated February 27, 1996 (the "February 1996 Report"), which recites a single inconsistent statement by Cintron to the police during an investigation regarding Robles' whereabouts.

(i) Post-trial affidavits

Petitioner cannot show "cause" with respect to the post-trial affidavits indicating that Cintron's testimony was coerced because Petitioner cannot demonstrate that the Commonwealth either willfully or inadvertently suppressed any such evidence. See Banks, 540 U.S. at 691 (establishing that Brady claim requires a showing that evidence was "suppressed by the State, either willfully or inadvertently"). The duty to disclose Brady material is not contingent upon a request by the accused. United States v. Agurs, 427 U.S. 97, 107 (1976). The duty of disclosure is not limited solely to evidence that a "prosecutor is aware of, rather it extends to evidence known only to police investigators and not to the prosecutor." Smith, 210

-22-

F.3d at 195 (internal quotation marks and citation omitted).
Therefore, a prosecutor is charged with the responsibility of
"learn[ing] of any favorable evidence known to the others acting
on the government's behalf in the case, including the police."
Id. (quoting Kyles, 514 U.S. at 437).  An important limitation on
this duty, however, is that Brady does not require the prosecutor
to provide information that the defendant can himself obtain with
reasonable diligence.  See United States v. Pelullo, 399 F.3d
197, 213 (3d Cir. 2005); Gov't of Virgin Islands v. Martinez, 780
F.2d 302, 318 (3d Cir. 1985); United States v. Starusko, 729 F.2d
256, 262 (3d Cir. 1985).

       Assuming that information existed that Cintron was
coerced by Robles and the Reading Police, Petitioner cannot show
that this information was suppressed by the Commonwealth.
Importantly, Petitioner points to no evidence to show that the
prosecutor for the Commonwealth was actually aware of the alleged
coercion by either Robles or the Reading Police.

       Absent any evidence that the Commonwealth prosecutor
was aware of the alleged coercion, his knowledge with respect to
this impeachment evidence could be imputed only where the
information was available to an agent acting on the
Commonwealth's behalf.  See United States v. Risha, 445 F.3d 298,
306 (3d Cir. 2006) (noting that a "Brady violation may be found
despite a prosecutor's ignorance of impeachment evidence . . .

when the withheld evidence is under the control of a state instrumentality closely aligned with the prosecution") (internal quotation marks and citation omitted). First, since Robles clearly does not qualify as an individual acting on behalf of the Commonwealth, there was no duty on behalf of the Commonwealth to discover such evidence. If no duty existed for the Commonwealth to learn of such evidence, then it could not be considered suppressed, and thus Petitioner cannot establish "cause."

Second, with respect to the statements in the post-trial affidavits recounting Cintron's statement that she was coerced by the Reading Police, and therefore had a bias or motive to lie while on the stand, the Commonwealth was not required to disclose this alleged information on the basis that it was available to Petitioner through the exercise of reasonable diligence. Petitioner had sufficient access to Cintron based upon her status as a trial witness and Petitioner had the opportunity to cross-examine Cintron with respect to her motives for testifying.

Ordinarily, improper motive or bias is tested through the time-honored method of cross-examination. Therefore, when a Brady claim is based upon an allegation of a witness's improper motive or bias which had not been disclosed by the prosecution prior to trial, the claimant must show that he did not have a full and fair opportunity to cross-examine the witness at trial.

See <u>Fell v. Patrick</u>, Civ. A. No. 06-4751, 2007 WL 2668879, at *5
(E.D. Pa. Sept. 6, 2007) (DuBois, J.) (concluding that cross-
examination of a witness would have allowed a defendant to
discover allegedly suppressed evidence through the exercise of
"reasonable diligence") (citing <u>Pelullo</u>, 399 F.3d at 213).

       In this case, because the evidence relating to the
alleged coercion by Reading Police could have been obtained by
Petitioner through the exercise of reasonable diligence,
including the opportunity to cross-examine during trial,
Petitioner cannot show that this information was unlawfully
suppressed.  Thus, the element of "cause" does not exist and the
procedural default rule precludes review.

                   (ii)  July 1998 Report

       Petitioner cannot establish that the alleged
nondisclosure of the July 1998 Report satisfies the materiality
standard under <u>Brady</u>, thus no prejudice exists.  The July 1998
Report involved an alleged assault by Cintron on July 7, 1998,
which Petitioner concedes was a mere two days before Cintron
testified at Petitioner's murder trial.

       Assuming that the Commonwealth could have discovered
the July 1998 Report in light of the proximity in time to
Cintron's testimony, it would have been inadmissible and thus
immaterial under <u>Brady</u>.  First, the July 1998 Report does not
indicate that any formal charges were pending at the time Cintron

                            -25-

testified, and therefore it could not constitute <u>Brady</u> material based on the reasoning previously discussed with respect to Robles' "uncharged criminal conduct."  Second, even assuming that Cintron had been convicted of simple assault and harassment, as suggested by the July 1998 Report, these convictions were inadmissible under Pennsylvania law to impeach because they do not involve dishonesty or false statement.  See <u>Com. v. Hall</u>, 867 A.2d 619, 638-39 (Pa. Super. Ct. 2005) (finding that witness' prior convictions for simple assault were inadmissible because they involved crimes of violence rather than falsity and deceit); <u>Com. v. Penn</u>, 439 A.2d 1154, 1160 (Pa. 1982) (stating that "it is well settled that a witness may be impeached on the basis of a prior conviction only if the crime involves dishonesty or false statement").  Therefore, any alleged withholding of the July 1998 Report did not prejudice Petitioner.

(iii) February 1996 Report

Petitioner's reliance on Cintron's single inconsistent statement in the February 1996 Report with respect to the February 27, 1996 shooting incident does not qualify as material evidence under <u>Brady</u>.  The February 1996 Report recounts an inconsistent statement made by Cintron to Detective Cabrera during the investigation of the shooting in which Cabrera was attempting to locate Robles to interview him about the incident. Initially, Cintron told Cabrera that Robles had traveled to New

York earlier in the day, however, she later admitted to Cabrera that Robles was actually in the Philadelphia area. Petitioner relies upon a single inconsistent statement in the February 1996 Report concerning a separate and unrelated incident which occurred two years before Petitioner's trial. Even assuming that this statement had been available for Petitioner's use in impeaching Cintron, there is no "reasonable probability" that a different outcome would have resulted in Petitioner's trial. See Youngblood, 547 U.S. at 870 (internal quotation marks and citation omitted).

        (c) Velazquez

        As with Cintron, Petitioner relies upon an affidavit produced post-trial recounting a statement from Velazquez that she provided a statement inculpating Johnson only after she was threatened by the Reading Police with criminal conspiracy charges, and therefore had a bias or motive to lie while on the stand. Petitioner again provides no evidence showing that the Commonwealth prosecutor was aware of any threatened charges or leniency agreement with Velazquez. It is true that "evidence regarding a witness's arrangements with the prosecution regarding pending criminal charges may affect the witness's credibility and thus may be material for Brady purposes." Simmons, 581 F.3d at 170. Petitioner fails to provide any evidence, however, of an express or implied agreement between Velazquez and the

prosecutor.  See Todd v. Schomig, 283 F.3d 842, 849 (7th Cir. 2002) ("Without an agreement, no evidence was suppressed, and the state's conduct, not disclosing something it did not have, cannot be considered a Brady violation.").

Therefore, in order to establish "cause" Petitioner must rely on the affirmative duty of the Commonwealth prosecutor to learn of the purported deal between Reading Police and Velazquez concerning the potential criminal conspiracy charges. Even assuming the prosecutor's duty extended to this information, Petitioner again fails to show that he could not have obtained the same information through the exercise of reasonable diligence.  As discussed above with respect to Cintron, when a Brady claim is founded on an allegation of a witness's improper motive or bias, the claimant must demonstrate that he did not have a full and fair opportunity to cross-examine the witness during trial in order to show that such information was unlawfully suppressed.

Petitioner clearly had access to Velazquez as a trial witness and therefore had a full and fair opportunity to cross-examine her with respect to her motives for testifying and the existence of any threats regarding criminal conspiracy charges. See Sims v. Patrick, No. Civ.A.04-3379, 2005 WL 2476226, at *7 (E.D. Pa. Oct. 5, 2005) (Yohn, J.) (finding that the factual predicate for a Brady claim that the prosecution withheld

evidence of deals it made with a witness could have been discovered through reasonable diligence because defendant's attorney had opportunity to cross-examine the witness on her motives and any alleged deals made with prosecutors). Therefore, since Petitioner cannot establish that evidence of an alleged deal with Velazquez was not available to him through the exercise of reasonable diligence, Petitioner cannot demonstrate "cause" with respect to this claim.

(d) Morales

Petitioner relies upon an affidavit by Morales and a November 2, 1996 police report (the "November 1996 Report") by Reading Police Detective Vega which allegedly provides an alibi for Petitioner's co-defendant Morales. Apparently, Petitioner believes that since he and Morales were riding in a car together at the time of the shooting, if Morales has an alibi then the alibi is equally applicable to him.

In his affidavit, Morales claims that he was not present in the area at the time that Martinez was shot because he was at the "courthouse"[8] to bail out a friend. Morales admits in the affidavit, however, that he saw Detective Vega near the scene of the homicide after it occurred. The November 1996 Report corroborates that Detective Vega saw Morales at the courthouse,

_____

[8] In the affidavit, Morales does not state the exact courthouse or where this courthouse is located in relation to the scene of Martinez's murder.

-29-

but does not provide a definitive date or time for this encounter.  More importantly, the November 1996 Report states that Detective Vega saw Morales near the scene of Martinez's homicide and questioned him about it.  Since the November 1996 Report evidences only that Detective Cabrera had an encounter with Morales at an earlier undetermined time and that he questioned Morales about the homicide near the location where it occurred, it is unclear how this would possibly demonstrate a cognizable alibi for Morales, let alone Petitioner.  Accordingly, if this police report had been disclosed to the defense, there is no reasonable probability that the result of Petitioner's trial would have been different.  See Youngblood, 547 U.S. at 870.  Therefore, Petitioner cannot establish that this information was material under Brady, and therefore cannot demonstrate that prejudice exists to excuse the procedural default.

2.  Fundamental Miscarriage of Justice

A second avenue for overcoming procedural default is for Petitioner to show that a "fundamental miscarriage of justice" has occurred.  See Slutzker, 393 F.3d at 381 (internal citation omitted).  In this case, even after extensive discovery, Petitioner fails to produce evidence that he is actually innocent.  See Schlup v. Delo, 513 U.S. 298, 316 (1995); Keller v. Larkins, 251 F.3d 408, 415-16 (3d Cir. 2001).  Therefore, a finding of a "fundamental miscarriage of justice" is not

warranted in this case.

D.  Motion to Compel Deposition of Sheriff Weaknecht

After a full opportunity for discovery, Petitioner has not established that his alleged Brady claim is meritorious. Therefore, the procedural default rule bars review.  Under the circumstances, Petitioner's motion to depose Sheriff Weaknect is denied as moot.[9]


IV. CONCLUSION

For these reasons, Petitioner's motion to depose Sheriff Weaknecht will be denied as moot.  An appropriate order will issue.

_____

[9]  Respondent filed a motion for leave to file a supplemental response to Petitioner's supplemental memorandum (doc. nos. 157, 159).  As the Court has determined that no further briefing is necessary to decide this issue, the motion for leave to file a supplemental response will be denied.